S O DESIGNS USA, INC., a Delaware corporation, et al., Respondents,

v.

ROLLERBLADE, INC., a Delaware corporation, et al., Appellants,

Robert O. Naegele, Jr., Defendant.

No. C5-00-984.

Court of Appeals of Minnesota.

Dec. 12, 2000.

Review Denied Feb. 21, 2001.

---

Craig D. Greenberg, Huffman, Usem, Saboe, Crawford & Greenberg, P.A., Minneapolis, MN, for respondents.

Jerry W. Snider, Charles F. Webber, Deborah A. Ellingboe, Faegre & Benson LLP, Minneapolis, MN, for appellants.

Considered and decided by KLAPHAKE, Presiding Judge, HARTEN, Judge, and ANDERSON, Judge.

## OPINION

KLAPHAKE, Judge

Appellants Rollerblade, Inc., Nordica, S.p.A. and Benetton Group S.p.A. challenge the summary judgment entered against them on four counts of breach of contract alleged in their complaint. Because there are no genuine issues of material fact and the district court did not err in its application of the law, we affirm.

## FACTS

Scott Olson is the inventor or co-inventor of the in-line skate.[1] Around 1980, Olson began marketing a product under the Rollerblade trade name through a company called North American Sports Training Corporation (NAST). At some point in the 1980's, Robert Naegele, Jr., provided financing to NAST through a corporation he owned called Second Stage, Inc. In 1985, Olson, as seller, entered into a stock purchase agreement (1985 agreement) to sell the shares of NAST to Second Stage.

By terms of the 1985 agreement, Olson agreed to sell all his shares in NAST to Second Stage, but as part of the deal he received back 263 of his shares in NAST. The contract further stated:

> To the extent [Olson] may have any possessory or equitable ownership interest or rights to the tradename or trademark "Rollerblades" or any intellectual property right or other interest in Rollerblades or the Subject Products, [Olson] hereby irrevocably assigns and transfers, and grants a perpetual, worldwide, exclusive license to [Second Stage] with respect to, any and all such interests or rights.

The 1985 agreement also gave Olson the right to certain royalties on sales of Rollerblade brand products, with different rates for different regions of the world. Royalties were to be paid on "Net Collected Funds," defined as the funds "actually received by [Second Stage] computed on a cash basis as a result of its sale of the Subject Products" less certain deductions. The royalty period ran from October 1, 1987, to September 30, 1997. In the case of sales in Europe, which are at issue here, Olson was to receive a royalty of one-half percent of "Net Collected Funds from sales of the Subject Products in Europe,"

up to $4 million, and two percent over $4 million. The 1985 agreement permitted reduction of these royalties by up to one-half if necessary to procure additional financing. The agreement also contained a non-assignment clause, prohibiting assignment of rights or obligations under the contract without the written consent of the other parties.

Shortly after entering into the 1985 agreement, Second Stage became Rollerblade, Inc., a Minnesota corporation. Olson's royalties were reduced by one-half by virtue of the contract clause permitting the reduction to obtain financing. Naegele had triggered the reduction by insisting upon a royalty reduction before investing further. This inspired litigation in 1988, which was settled by the 1991 Stock Purchase and Settlement Agreement (1991 agreement).

The 1991 agreement purports to be between Olson and Naegele as individuals, although the recitations to the contract state that its purpose is to settle the litigation between Olson and Rollerblade. While Naegele signed the document as an individual, he asserted that he had "full power and authority to enter into this Agreement, to purchase the Shares and to obtain the settlement of the Action and of the Claims hereunder." Olson agreed to sell his remaining stock to Naegele and to permanently reduce the royalty percentage. Section 4 of the 1985 agreement, which deals with royalty rights and the grant of the license, was incorporated into the 1991 agreement. Contemporaneously with the signing, Naegele agreed to deliver releases from both the Minnesota and Delaware Rollerblade firms[2] and Second Stage. The releases acknowledged Olson's right to continue receiving royalties, and included an opinion of counsel that Olson was entitled to continue receiving royalties

---

1. There is a dispute between Olson and his brother concerning which of them invented the in-line skate. This issue is not the subject of this suit.

2. In 1991, Nordica became a 50 percent shareholder in Rollerblade, and Rollerblade became a Delaware corporation. In 1997, Naegele sold his remaining 50 percent stake to Nordica and a minority shareholder.

as set forth in the 1985 agreement. The 1991 agreement also included a non-assignment clause, and a provision for the payment of attorney fees, costs and disbursements to the prevailing party in any action to enforce the agreement. Paragraph 10(b) includes the following integration clause: "[t]his Agreement and the exhibits [the releases] hereto contain the entire agreement of the parties hereto * * *."

In 1993, in order to increase otherwise sluggish sales in Europe, Rollerblade entered into a license agreement with Nordica to both market and manufacture Rollerblade products in Europe. Nordica agreed to pay a royalty of between three and four percent of European sales to Rollerblade. Rollerblade retained the right to manufacture and sell Rollerblade products in the European market. This licensing agreement was made without the knowledge or consent of Olson. Rollerblade paid Olson his royalty only on the sales that Rollerblade made in Europe and not on sales made by Nordica or on the royalties paid by Nordica to Rollerblade.

In 1996, Rollerblade entered into a license agreement with a subsidiary of Benetton,[3] giving Benetton the right to manufacture and sell certain clothing items with the Rollerblade trademark. This licensing agreement was also made without the knowledge or consent of Olson. Rollerblade received royalties from Benetton, but again paid no royalties to Olson on sales by Benetton or on the royalties it received from Benetton.

In 1997, Olson discovered that sales of Rollerblade products, accessories and clothing were much greater than Rollerblade had disclosed, based on Rollerblade's licensing agreements with Nordica and Benetton. He sued Rollerblade, Nordica and Benetton for unpaid royalties.

On cross motions for summary judgment, the district court granted judgment to Olson for his four breach of contract counts, and on a stipulated damages count. In order to facilitate this appeal, the parties stipulated to damages. The stipulation provides for a damages formula to be applied if this court affirms the district court's "liability and damages determination."

Summary judgment was granted in favor of Olson on the following counts: count one alleges that Rollerblade breached the 1985 and 1991 agreements by failing to make royalty payments for sales made under the Nordica/Rollerblade license agreement for the years 1993–97; count two alleges that Rollerblade failed to make royalty payments on Black Hole products, a Rollerblade accessory brand, during 1994–97; count nine alleges that Rollerblade and Benetton owe royalties for the sale of Rollerblade brand or related brand clothing; and count ten alleges that Rollerblade, Nordica, and Benetton failed to make final royalty payments on sales of subject products that occurred prior to the September 30, 1997, conclusion of the royalty period, but payment for which was received after September 30. Appellants also challenge the award of damages and attorney fees.

### ISSUES

1. Did the district court err in granting summary judgment against Rollerblade on the issue of royalty payments made under the 1991 agreement?

2. Did the district court err in granting summary judgment against Rollerblade under the non-assignment clause of the 1991 agreement for sales of Black Hole products?

3. Did the district court err in granting summary judgment against Rollerblade and Benetton under the non-assignment clause of the 1991 agreement for sales of Rollerblade and related-brand clothing?

**3.** Nordica and Benetton Sportsystem, S.p.A. have since merged into Benetton Group, S.p.A.

4. Did the district court err in granting summary judgment against Rollerblade, Nordica and Benetton on the issue of final royalty payments for sales made during the royalty period but not collected until after the end of the royalty period?

5. Did the district court err in its calculation of damages?

## ANALYSIS

■■■ "On an appeal from summary judgment, we must examine two questions, whether there are any genuine issues of material fact and whether the lower courts erred in their application of the law." *Cummings v. Koehnen,* 568 N.W.2d 418, 420 (Minn.1997) (citation omitted). "A reviewing court must view evidence in the light most favorable to the party against whom summary judgment was granted." *Vetter v. Security Continental Ins. Co.,* 567 N.W.2d 516, 520 (Minn.1997) (citation omitted).

■■■ Where there are no genuine issues of material fact, the appellate court reviews the district court decision de novo to ascertain whether it erred in its application of the law. *Art Goebel, Inc. v. North Suburban Agencies,* 567 N.W.2d 511, 515 (Minn.1997). The purpose of construction of an otherwise unambiguous contract is to "give effect to the intention of the parties as expressed in the language they used in drafting the whole contract." *Id.*

■■■ Language in a contract should be given its "plain and ordinary meaning." *Turner v. Alpha Phi Sorority House,* 276 N.W.2d 63, 67 (Minn.1979) (citations omitted). Contract terms should be "read in the context of the entire contract." *Kauffman Stewart v. Weinbrenner Shoe Co.,* 589 N.W.2d 499, 502 (Minn.App.1999) (citations omitted). If the wording of the contract is clear and unambiguous, the reviewing court cannot go beyond the language of the contract in interpreting it. *Id.*

## I. Construction of the 1991 Agreement

Central to the issues in this case is the interpretation of the 1991 agreement. Rollerblade has argued on several grounds that it is not a party to the contract or that various terms of the contract do not apply to it, and, by extension, to Nordica and Benetton. We are not persuaded by these arguments.

The 1991 agreement, which incorporates the royalty provisions of the 1985 agreement, is unambiguous. The essence of this agreement is that Olson agreed to sell his stock, continue to license Rollerblade to manufacture and sell Rollerblade products, and acquiesce in a permanent royalty reduction in exchange for Rollerblade's agreement to continue paying him royalties. The basic elements of contract law, offer, acceptance and an exchange of consideration, were thus satisfied. *See Cederstrand v. Lutheran Bhd.,* 263 Minn. 520, 521–22, 117 N.W.2d 213, 220–21 (1962).

■■■ Rollerblade now argues that Olson had no intellectual property to transfer and that the apparent grant of a license is nothing but verbal wordplay. Even if Olson's license or assignment was valueless, or the trade name not as valuable when transferred, it does not change this basic fact: the parties bargained for and received the rights and duties plainly set forth in this contract. Thus, Rollerblade's claim is insufficient to void an otherwise valid contract. *See A.A. Metcalf Moving & Storage Co. v. North St. Paul Sch.,* 587 N.W.2d 311, 318 (Minn.App.1998) ("A party's unilateral mistake in entering into a contract is not a basis for rescission unless there is an ambiguity, fraud or misrepresentation or where the contract may be rescinded without prejudice to the other party."). Further, the parties' performance on this contract over a 10–year period dispels any argument that the subject of the contract is ambiguous. *See Johnson v. Quaal,* 250 Minn. 154, 157, 83 N.W.2d 796, 798–99 (1957) (ambiguity in contract terms can be cured by subsequent conduct of the parties).

We also agree that Rollerblade is a party to the 1991 agreement. Although the primary document is signed by Naegele as an individual, the entire contract consists of all the settlement documents, including the releases. A written contract must set forth all essential terms of an agreement in order to be enforceable, including the identities of the parties to the contract. *Poser v. Abel,* 510 N.W.2d 224, 227 (Minn.App.1994), *review denied* (Minn. Jan. 4, 1994). However, a contract may consist of many documents, if they are executed at the same time and pertain to the same subject matter. *Id.* The 1991 agreement specifically acknowledges that the releases are essential to the agreement. Viewing the documents as a whole, the parties to the 1991 agreement clearly intended that Rollerblade be bound by the contract.

Nor are we persuaded by Rollerblade's argument that it did not violate the non-assignment clause because it gave Nordica a license rather than an assignment. An assignment is simply the "transfer of rights or property." Black's Law Dictionary 115 (Bryan A. Garner ed., 7th ed.1999). A license provides a party permission to "commit some act that would otherwise be unlawful," or, to fit the current situation, the grant of a right to manufacture and sell items that would otherwise be unlawful. *Id.* A license, then, is included within the general principle of assignment. It is possible to assign less than all rights in a transferable interest. *See, e.g., Larx Co. v. Nicol,* 224 Minn. 1, 21, 28 N.W.2d 705, 716 (1947) (respondent did not violate non-assignment clause by assigning only revenue stream and royalties and retaining copyright or trademark rights, assignment of which would have violated agreement).

Rollerblade assigned to Nordica its right, or at least a portion of that right, to the exclusive use of the Rollerblade tradename. The 1991 agreement clearly prohibits assignment without the written permission of Olson.

Finally, Rollerblade argues that the agreement limits royalty payments to sales that Rollerblade made through its own efforts, based on the contract's definition of "Net Collected Funds" as ("*its* sales of the Subject Products") (emphasis added). Rollerblade had the exclusive right to manufacture and sell using the tradename Rollerblade, which it assigned to Nordica. When an assignment is made, the assignee assumes the duties under the contract; the assignor remains liable if "performance is substantially different [by the assignee] than performance by the original party." *Epland v. Meade Ins. Agency,* 564 N.W.2d 203, 207 (Minn. 1997) (citations omitted). The assignor cannot be divested of the duty to perform without the express consent of the other party to the contract. *Id.* Therefore, either Nordica or, upon Nordica's failure to pay, Rollerblade, had the duty to continue to pay Olson royalties.

The district court's construction of the contract is not clearly erroneous; Rollerblade is a party to the contract and, as assignor, remains responsible for payments of royalties on sales made by Nordica.

**II. Royalties on Related Products**

Rollerblade argues that the district court erred in awarding royalties to Olson based on sales of Black Hole products. The district court found that Black Hole products were included within the definition of "Subject Products," and thus triggered a right to royalties.

The 1985 agreement defined "Subject Products" to include "the in-line roller street skate known as 'Rollerblades' and all replacement parts therefore and components thereof (collectively referred to herein as 'Rollerblades')." The Black Hole products are replacement parts for Rollerblades and other in-line skates. Rollerblade suggests that "replacement parts" refers only to Rollerblade brand replacement parts, and not those sold under the

logo Black Hole, which the corporation acquired in 1994.

As there is no ambiguity in this definition, it is improper for us to go beyond the plain language in construing this definition. *See Kauffman Stewart,* 589 N.W.2d at 502. The definition includes all replacement parts. If the parties had intended to exclude replacement parts manufactured under different trade names, they could easily have done so. Certainly the value of the replacement parts is enhanced by associating it with a well-known brand.

The district court properly awarded royalties on Black Hole products because they are included in the contract's definition of "Subject Products."

### III. Clothing Sales by Benetton

 Rollerblade and Benetton maintain that the district court erred in awarding royalties based on clothing sales made by Benetton under the license Rollerblade gave to Benetton in 1996. The district court found that the clothing was included within the definition of "Subject Products," which triggered liability for royalties, and that Benetton was liable as an assignee.

The definition of "Subject Products" includes

all clothing or apparel bearing the name 'Rollerblades' or bearing any logo or symbol used by the Company to identify its Rollerblades-related products; as such products may be modified or enhanced.

We see no ambiguity in this contract clause. *See Kauffman Stewart,* 589 N.W.2d at 502 (where contract unambiguous, court must apply contract language in interpreting it). Further, Rollerblade, as assignor, and Benetton, as assignee, are responsible for the royalty payments under the contract. *Epland,* 564 N.W.2d at 207.

### IV. Final Royalties

 Rollerblade, Nordica and Benetton all challenge the district court's award of royalties for sales made during the roy-

alty period of October 1, 1987, to September 30, 1997, for which receivables remained unpaid after the end of the royalty period.

The basic royalty provision of the contract is contained in the 1985 agreement at Article 4.3. This clause, which was incorporated by reference into the 1991 agreement, states:

[Rollerblade] hereby agrees to pay to [Olson] royalties on the sale of Subject Products as set forth in this Section 4.3 within 75 days of the end of each calendar quarter during the Royalty Period commencing with the calendar quarter first ending within the Royalty Period and continuing for each calendar quarter thereafter during the Royalty Period.

The appellants believe that the definition of "Net Collected Funds" supports their position that only funds collected during the royalty period are subject to royalty payments. However, this requires reading more into that definition than its plain meaning. "Net Collected Funds" is defined as

the amount of funds actually received by the Company computed on a cash basis as a result of its sale of the Subject Products [less certain deductions].

There is no time limit in this definition that would contradict the basic royalty provision requiring payment for all sales made within the royalty period. We conclude that the district court did not err in its interpretation of the plain language of the contract. *See Turner,* 276 N.W.2d at 67.

### V. Damages

 Rollerblade, Nordica, and Benetton also challenge the district court's award of damages, claiming that the district court relied on an incorrect measure of damages. The parties to this case derived and stipulated to the damage figure used by the court, as follows:

[Appellants] will be bound by the damages figures set forth in paragraph one

of this stipulation with respect to each count on which the Court of Appeals affirms or does not disturb the District Court's liability and damages determination.

A stipulation of this nature is no more than a binding contract that parties are free to enter into and courts are expected to honor. *See Pollock–Halvarson v. McGuire,* 576 N.W.2d 451, 455 (Minn.App.1998), *review denied* (Minn. May 28, 1998) (parties have an unfettered right to contract and courts will not invalidate a lawful agreement, even if unwise or improvident). Because this court is affirming the decision of the district court, this condition has been met and the damages award shall stand as stipulated.

Appellants have also asked that the award of attorney fees be struck if they prevail in their appeal. In light of our decision, we decline to disturb the district court's award of attorney fees.

## DECISION

The district court did not err in its interpretation of the language of the contract. Rollerblade, as assignor, remained liable for performance on the contract, and Nordica and Benetton, as assignees, assumed the duties under the contract. The district court did not err in determining damages, where the parties had stipulated to the damage award and the condition precedent for the award, that this court affirm the district court, had been met. The district court's award of attorney fees will not be disturbed, because the respondent, Olson, is the prevailing party.

**Affirmed.**